UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| **LIFE SKILLS, INC.,** | ) |
| Plaintiff, | ) |
| v. | ) Civil No. 4:22-cv-40064-MRG |
| **HARLEYSVILLE INSURANCE COMPANY,** | ) |
| Defendant. | ) |

### MEMORANDUM AND ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

**GUZMAN, J.**

Plaintiff Life Skills, Inc. ("Life Skills") filed this two-count lawsuit against its insurer, Defendant Harleysville Insurance Co. ("Harleysville"). Count I claims breach of contract resulting from Harleysville's failure to pay for physical property loss alleged to be covered by Life Skills' commercial insurance policy. Count II alleges that Harleysville's acts and omissions in connection to denying coverage for the loss constitute bad faith claims handling, in violation of Mass. Gen. Laws Chapters 93A and 176D.[1]

Before the Court is the Defendant's motion for summary judgment. [ECF No. 48]. For the reasons stated below, the Court **DENIES** Defendant's motion for summary judgment on **Count I** (Breach of Contract) and **GRANTS** its motion as to **Count III** (Bad Faith).

---

[1] The suit originally included a declaratory judgment claim (Count II) which was previously dismissed as moot. [ECF No. 19].

1

I.   **FACTUAL BACKGROUND**

   a. **The Parties and The Underlying Claim**

Plaintiff Life Skills is a non-profit social service agency which provides residential and day habilitation services to adults with autism and intellectual and developmental disabilities. [Am. Compl. ¶ 1, ECF No. 9]. Life Skills operates various facilities in Massachusetts, including its head office at 44 Morris Street, Webster, Massachusetts ("the Property"). [Id.] The Property is covered by a commercial package insurance policy provided by Defendant Harleysville, with building coverage limits set at $3,038,300. [Id. ¶ 3; ECF No. 49 at 2].

On May 5, 2020, Life Skills' maintenance supervisor, Joseph Daniels ("Daniels"), was informed of damage in a ceramics classroom situated in the basement level of the Property, where the floor had "sunk" between eight to twelve inches at the northeast corner. [Daniels Dep. 22:11-24, 33:7-20, ECF No. 47-2; ECF No. 50 ¶¶ 4, 5; Am. Compl. ¶ 4]. The ceramics classroom contained, among other things, two large kilns, weighing approximately 200 pounds. [ECF No. 50 ¶ 6]. Daniels noted that the classroom floor had sagged, was bouncing, and that a section of the floor had partially detached from the Property's exterior wall. [ECF No. 50 ¶¶ 9, 10].

Concerned that the entire floor might collapse, Life Skills hired Johnson Exteriors ("JE") a day or so later to remove or cut away at the flooring and investigate the cause of the damage. [Daniels Dep. 37:4-5, 43:4-7, 78:13-14]. JE removed about a quarter to a third of the planking, which exposed deteriorated and compromised support beams. [Id. 45:4-22]. Life Skills directed JE to stop work and contracted Cole Contractors ("Cole") to remove the remainder of the floor. Id.

Later that day, or early on May 6, 2020, Cole removed the rest of the flooring, revealing that "everything was rotted" and that the structural beams underneath showed severe deterioration. [Amick Dep. 47:13-14, 61:8-14, ECF No. 47-3; Johnson Dep. 34:12, ECF No 47-4]. Cole

2

discovered one column was not positioned on a pier and another precarious column rested on a pier with a dead root. [Cole Dep. 126:18-21]. Mr. Amick, Life Skills' CEO, testified that due to safety concerns, he roped off the area to prevent access. [Amick Dep. 48:20-22]. Subsequently, Life Skills retained Robert Johnson ("Johnson"), a structural engineer, to design a temporary support system for the second floor above the ceramics classroom, which, due to the "failed first floor structure," had also become unsafe for occupancy. [Johnson Dep. 86:25; Cole Dep. 128:17; ECF No. 50 ¶ 13].[2]

Harleysville received notice of Life Skills' loss on May 6, 2020, and assigned Michael Coffey ("Coffey"), an in-house representative, to handle the case. [Amick Dep. 106:3-5; ECF No. 50 ¶ 17]. Coffey retained an independent adjuster, Armand Parmian ("Parmian"), who inspected the site on May 12, 2020. [ECF No. 49-3 at 2]. Initially, Parmian reported no issues regarding coverage. [Id.] In his report, Parmian stated that "[t]he weight of (2) kilns in the Workspace Area caused the flooring to collapse and cause [sic] damage to laminate flooring, subflooring, concrete anchor blocks, joisting and a foundation wall." [Id.]

On June 8, 2020, Coffey emailed Life Skills to confirm that coverage was provided for damages resulting from hidden decay. [ECF No 49-5 at 2]. That same day, he sent a letter to Life Skills detailing an actual cash value (ACV) payment of $49,481.06 and requested that Life Skills submit any invoices related to demolition costs they had incurred. [Id. at 3]. Subsequently, Life Skills submitted an initial repair estimate of $264,000. [Brown Dep. 47:5, ECF No. 47-6].

Although Harleysville had previously confirmed coverage for the loss in the ceramics classroom, on June 10, 2020, it sent a forensic structural engineer, Michael Brown of EFI Global

---

[2] The Court notes that this fact is partially disputed. Plaintiff admits that Johnson designed a temporary support system for the second floor but adds, "the temporary support system prevented repair and use of the first floor." [ECF No. 50 ¶ 17]. While the Court must draw all inferences in favor of the nonmoving party, it considers this a minor dispute concerning a nonmaterial fact that does not impact the Court's decision.

("EFI"), to inspect the Property.[3] [ECF No. 50 ¶ 20]. Prompted by the initial reports of the inspection, on June 21, 2020, Harleysville's representative, Giuseppe Corallo, sent a reservation of rights letter to Life Skills. [ECF No. 50 ¶ 21; ECF No. 49-7 at 2]. This letter notified Life Skills of possible coverage issues and stated that payment on the previously issued check would be stopped. [ECF No. 50 ¶ 21; ECF No. 49-7 at 2]. In particular, Harleysville raised doubts about whether the observed facts and damages satisfied the policy's criteria for "Additional Coverage – Collapse" and indicated that it was withholding a decision on the claim until a thorough investigation could determine both parties' respective rights and responsibilities under the Policy. [ECF No. 47-10 at 2-4].

On June 26, 2020, EFI issued a written report finding that: "the reported vertical displacement of the floor at the northwest corner of the ceramics room was caused by long-term, on the order of decades, deterioration, in the form of decay of the floor structure's timber beams." [ECF No. 47-13 at 15]. However, the report clarified that this "vertical displacement" was "not consistent" with the International Building Code's definition of the term "collapse."[4] [Id.] According to the report, a collapse occurs "when a structure or portions of a structure fall from their intended position onto the ground or floor below." [Id. at 6-7]. The report further identified "elevated levels of moisture in the crawlspace" as the cause of the floor decay. [Id.]

On July 9, 2020, following the receipt of the EFI engineering report, Harleysville sent a letter to Life Skills denying coverage. [ECF No. 47-11 at 6]. The denial was based on the conclusion that, "[the] loss was caused by long term deterioration of the timber beams in the crawl

---

[3] Plaintiff admits this fact but adds: "EFI was retained not for purposes of coverage but for purposes of potential subrogation and, only after Life Skills submitted a repair estimate approximating $250,000 did EFI and Harleysville focus on coverage issues." [ECF No. 50 ¶ 20].

[4] Plaintiff admits this fact but adds: "Brown did not know the definition of 'collapse' in the Policy, he was unaware that the condition was unknown to Life Skills and the Policy did not require that the floorboard drop to the earth floor below." [ECF No. 50 ¶ 22].

space due to moisture," a condition not covered under the Policy. [ECF 47-11 at 6]. Harleysville emphasized that the resultant vertical displacement of the floor did not align with the Policy's definition of a "collapse" and was not caused by an overloaded condition. [Id.] The denial letter cited findings from the EFI's report and referred to the relevant Policy provisions and definitions outlined in "[The] Causes of Loss—Special Form."[5] [Id. at 6-7].

In May 2021, Life Skills hired Mario Dies ("Dies"), a public adjuster, who challenged Harleysville's denial of coverage. [ECF No. 47-11 at 3]. Dies argued that the damage clearly met the Policy's definition of "Collapse" and thus warranted coverage. [Id.] After reviewing Mr. Dies' letter and materials relating to the claim, Harleysville maintained its stance and reiterated the denial of coverage. [ECF No. 50 ¶ 25].

Life Skills then initiated this litigation, seeking damages totaling $402,801.00. [ECF No. 9]. This amount is intended to cover "permanent repairs to the entire support structure of the second floor above the failed wooden planning" of the Property, along with "additional repairs, estimated at approximately $300,000," based on a quote provided by Cole Contracting. [ECF No. 49 at 7-8; ECF No. 47-11 at 11].

b. The Insurance Policy

The parties agree that the relevant provision of the contract is "[The] Causes of Loss— Special Form" (CP 00 10 06 07). [J. Stip., ECF No. 49-1 at 2]. This form specifies the causes of damage covered by the policy. It provides, in relevant part:

> **A.  Covered Causes of Loss**
> When Special is shown in the Declarations, Covered Causes of Loss means Risks Of Direct Physical Loss unless the loss is:
>
> **1.**  Excluded in Section **B**., Exclusions; or
> **2.**  Limited in Section **C**., Limitations that follow:

---

[5] Plaintiff admits this fact but adds: "[Harleysville also declined covered on the basis of] Corallo's analysis of Policy terms, which omitted the provisions relied upon by Coffey of Harlesyville." [ECF No. 50 ¶ 23].

> **B.** **Exclusions**
>
> ****
>
> **1.** We will not pay for loss or damage caused by or resulting from any of the following:
>
> ****
>
> > **d.** **(1)** Wear and tear
> >
> > **(2)** Rust or other corrosion, decay deterioration, hidden or latent defect or any quality in property that causes it to damage or destroy itself; ***
> >
> > **(4)** Settling, cracking, shrinking or expansion
>
> ****
>
> **f.** Continuous or repeated seepage or leakage of water, or the presence or condensation of humidity, moisture or vapor, that occurs over a period of 14 days or more.
>
> ****
>
> **k.** Collapse, including any of the following conditions of property or any part of the property:
>
> > (1) An abrupt falling down or caving in;
> > (2) Loss of structural integrity, including separation of parts of the property or property in danger of falling down or caving in; or
> > (3) Any cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion as such condition relates to **(1)** or **(2)** above.

[ECF No. 47-1 (hereinafter, "Policy") at 159-162]. Because collapse is a generally excluded cause of loss, Life Skills relies on an additional coverage provision, which supplants the collapse exclusion, and reinstates coverage:

> **D. Additional Coverage – Collapse**
>
> The coverage provided under this Additional Coverage – Collapse applies only to an abrupt collapse as described and limited in **D.1.** through **D.7.**
>
> > 1. For the purpose of this Additional Coverage – Collapse, abrupt collapse means an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its intended purpose.

6

    **2.** We will pay for direct physical loss or damage to Covered Property, caused by abrupt collapse of a building or any part of a building that is insured under this Coverage Form or that contains Covered Property insured under this Coverage Form, if such collapse is caused by one or more of the following:

        **a.** Building decay that is hidden from view, unless the presence of such decay is known to an insured prior to collapse;

* * * *

    **3.** This Additional Coverage – Collapse does not apply to:

        **a.** A building or any part of a building that is in danger of falling down or caving in;

        **b.** A part of a building that is standing, even if it has separated from another part of the building; or

        **c.** A building that is standing or any part of a building that is standing, even if it shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion.

[Policy at 165].

## II. LEGAL STANDARD

"Summary judgment is appropriate only when the record reveals that 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" Maymi v. P.R. Ports Auth., 515 F.3d 20, 25 (1st Cir. 2008) (quoting Fed. R. Civ. P. 56(a)). "An issue is 'genuine' when a rational factfinder could resolve it either direction." Mu v. Omni Hotels Mgmt. Corp., 882 F.3d 1, 5 (1st Cir. 2018) (citation omitted). "A fact is 'material' when its (non)existence could change a case's outcome." Id. (citation omitted). In evaluating whether genuine disputes of material fact exist, "all reasonable inferences must be drawn in the non-movant's favor." Easthampton Congregational Church v. Church Mut. Ins. Co., 322 F. Supp. 3d 230, 232 (D. Mass. 2018). Summary judgment is inappropriate when the evidence on the record is sufficiently "open-ended to permit a rational factfinder to resolve the issue in favor of either side." Nat'l Amusements v. Town of Dedham, 43 F.3d 731, 735 (1st Cir. 1995).

"Interpretation of an insurance contract is a question of law appropriately decided at summary judgment." Cummings Props., LLC v. Pub. Serv. Ins. Co., 343 F. Supp. 3d 1, 3 (D. Mass. 2018) (citing Cody v. Conn. Gen. Life Ins. Co., 439 N.E.2d 234, 237 (Mass. 1982)). "Under Massachusetts law, [courts] construe an insurance policy under the general rules of contract interpretation, beginning with the actual language of the policies, given its plain and ordinary meaning." AIG Prop. Cas. Co. v. Cosby, 892 F.3d 25, 27 (1st Cir. 2018) (citation omitted). However, "a contract is ambiguous either where its terms are inconsistent on their face or where the phraseology can support reasonable differences of opinion as to the meaning of the words employed and obligations undertaken." Minturn v. Monrad, 64 F.4th 9, 14 (1st Cir. 2023) (citation omitted). If a contract's terms are ambiguous, the meaning of those terms "normally becomes a matter for the factfinder, and summary judgment is appropriate only if the extrinsic evidence presented about the parties' intended meaning is so one-sided that no reasonable person could decide to the contrary." Farmers Ins. Exch. v. RNK, Inc., 632 F.3d 777, 784 (1st Cir. 2011).

If an insurance policy term or phrase can reasonably be interpreted in more than one way, it is "strictly construed against the insurer" and in favor of the insured. Easthampton Congregational Church v. Church Mut. Ins. Co., 916 F.3d 86, 92 (1st Cir. 2019). "[A] term is not ambiguous or construed against the insurer merely because it is not explicitly defined in an insurance policy. Undefined terms may still be unambiguous, just as a term may remain ambiguous despite the insurer's attempt to define it." Verveine Corp. v. Strathmore Ins. Co., 184 N.E.3d 1266, 1272 n.9 (Mass. 2022).

In insurance coverage disputes, the insured bears the initial burden of establishing coverage, then the burden shifts to the insurer to establish an exclusion from coverage. Utica Mut. Ins. Co. v. Herbert H. Landy Ins. Agency, Inc., 820 F.3d 36, 41 (1st Cir. 2016) (citing Boazova v. Safety Ins. Co., 968 N.E.2d 385, 390 (Mass. 2012)). If the insurer satisfies that burden, "the burden

8

shifts back to the insureds to show an exception to the exclusion holds sway." Easthampton Congregational Church, 916 F.3d at 92 (citation omitted). The First Circuit has held that "[u]nder Massachusetts law, courts should err on the side of the narrowest plausible interpretation of the exclusion and resolve doubts about the scope of an exclusion in favor of the insured." Performance Trans., Inc. v. Gen. Star Indem. Co., 983 F.3d 20, 25 (1st Cir. 2020) (citing Hakim v. Mass. Insurers' Insolvency Fund, 675 N.E.2d 1161, 1165 (Mass. 1997)). Further, under Massachusetts law, "[m]ore specific contract terms ordinarily control over more general contract terms." Easthampton Congregational Church, 916 F.3d at 92 (citation omitted). "Therefore, if a policy provision is found to provide for coverage, then general exclusion clauses are inapplicable." Id.

Lastly, Massachusetts General Laws Chapter 93A, § 2 ("Chapter 93A") prohibits those engaged in trade or commerce from employing "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." MASS. GEN. LAWS ANN. ch. 93A, § 2. Under this statute, Sections 9 and 11 establish rights of action for individual consumers and businesses, respectively, against such practices. Id. §§ 9, 11. Additionally, Massachusetts General Laws ch. 176D, § 3(9) ("176D") outlines specific unfair claim settlement practices for insurance companies, which, while not directly violating Chapter 93A, can indicate unfair conduct under Chapter 93A § 11 if such practices also meet the criteria of "unfair or deceptive acts or practices" as defined in Chapter 93A § 2. Ora Catering, Inc. v. Northland Ins. Co., 57 F. Supp. 3d 102, 110 (D. Mass. 2014) (citation omitted); Polaroid Corp. v. Travelers Indem. Co., 610 N.E.2d 912, 917 (Mass. 1993) (citation omitted); MASS. GEN. LAWS ANN. ch. 176D, § 3(9).

In contrast, individual consumers under Chapter 93A § 9 can claim damages for 176D violations without proving they meet the Chapter 93A § 2 criteria for being unlawful. Polaroid Corp., 610 N.E.2d at 917. However, businesses like Life Skills, pursuing claims under Chapter 93A § 11, cannot solely base their claims on 176D violations as they do not independently

9

constitute a cause of action under this section. <u>Kiewit Constr. Co. v. Westchester Fire Ins. Co.</u>, 878 F. Supp. 298, 302 (D. Mass. 1994). Thus, if a business plaintiff's Chapter 93A claim is dismissed, there is no independent cause of action under 176D.

### III.  DISCUSSION

First, the Court addresses the breach of contract claim, which primarily concerns a dispute over Policy coverage. To resolve this, the Court must determine two key issues: whether Life Skills' loss qualifies as a "collapse" under the terms of the Policy, and whether any general Policy exclusions impact this determination. Last, the Court will address the Bad Faith claims.

#### A.  Breach of Contract Claim (Count I)

Life Skills claims that Harleysville breached its contractual obligation by denying coverage for the cost of replacing the ceramics classroom floor, arguing that the Policy's plain language covers the loss under "Section D. Additional Coverage - Collapse." [Am. Compl. ¶ 3; Policy at 159-168]. In its motion for summary judgment, Harleysville argues that the loss is not covered because the floor did not "abruptly collapse" as the Policy stipulates. Additionally, Harleysville maintains that the breach of contract claim is legally untenable, as coverage is explicitly precluded by the Policy's terms, conditions, and exclusions, notably those in Sections B and D.3. [ECF No. 51 at 2]. The core of this dispute hinges on how "abrupt collapse" is defined within the Policy and whether the facts clearly align with the criteria for additional coverage. See <u>Hakim</u>, 675 N.E.2d at 281. For the reasons detailed below, the Court finds that there are genuine issues of material fact that preclude granting summary judgment on Count I.

##### 1.  The Meaning of "Collapse"

First, the Court turns to the actual language of the policy. See <u>AIG Prop. Cas. Co.</u>, 892 F.3d at 27 (citing <u>Brazas Sporting Arms</u>, 220 F.3d at 4). Section D: Additional Coverage – Collapse provides that coverage applies only to an "abrupt collapse," defined in Section D1 as "an abrupt

10

falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its intended purpose." [Policy at 165]. Additionally, Section D.2 specifies that an "abrupt collapse" must be caused by an insured peril, such as "decay that is hidden from view, unless the presence of such decay is known to an insured prior to collapse." [Id.]

Harleysville argues that the damage to the ceramics room floor did not meet the Policy's definition of "abrupt collapse." Although the floor "sagged 8 to 10 inches," it did not completely fall to the ground. [ECF No. 46 at 17-18]. Further, even though the floor "had partially detached from the Property's exterior wall," it remained standing. [Id.] Harleysville notes that "Life Skills personnel and contractors walked on the floor to remove two large kilns that continued to be supported by the floor after it sagged." [Id.] Furthermore, Harleysville references the testimony of Mr. Johnson, Life Skills' structural engineer, who initially concluded a collapse had occurred but later retracted his opinion. He clarified that while the floor suffered a "structural failure due to rot and masonry deterioration," it did not qualify as an "abrupt collapse" under the Policy because the floor did not end up "on the dirt." [Johnson Dep. 132:2-20].

Life Skills, on the other hand, argues that its damage was a "collapse" under the Policy definition because the Additional Coverage – Collapse provision, unlike the IBC definition in the EFI report, includes "partial collapse" and does not specify a minimum vertical displacement to qualify as a collapse. [ECF No. 49 at 7]. Life Skills points out that the ceramics classroom floor, while supported by cinderblocks, was in a "state of structural failure" and had partially detached from the exterior wall due to its structural members being severely decayed. [ECF No. 50 ¶¶ 12, 34]. Thus, under Life Skills' interpretation, at the very least, part of a building (i.e. the detached portion of the floor) suffered an "abrupt collapse," because the damage was unexpected, and Life

Skills had no knowledge of the hidden decay prior to the incident. [Id. ¶ ¶ 10, 14; ECF No. 49-1 at 2].

Additionally, Life Skills cites evidence that the building could no longer be occupied for its intended purpose, thereby satisfying the Policy's definition of a collapse.[6] Cole, commenting on the state of the floor, described it as "failed" and emphasized its safety risk, stating, "I certainly wouldn't want anybody going over there and standing on it" because it was "absolutely" unsafe. [Cole Dep. 41:12-15, 128:17].

In sum, while both parties offer reasonable interpretations of the policy language as applied to the facts, the Court is not persuaded "that the policy language here unequivocally supports the interpretation of either party." See Hakim, 675 N.E.2d at 281. Mr. Johnson's retraction, if anything, confirms that reasonable minds can differ in characterizing the damage to the ceramics room floor as an "abrupt collapse." [See Johnson Dep. 132:2-20]. Courts in other jurisdictions have analyzed nearly identical policy language and determined it to be reasonably susceptible to more than one interpretation, and therefore, ambiguous. See e.g., Scorpio v. Underwriters at Llyod's, London, No. 10-325 ML, 2012 U.S. Dist. LEXIS 77751, at *15 (D.R.I. June 5, 2012) (finding a collapse provision ambiguous where section (a) of the definition would arguably grant coverage to a six-inch roof deflection but section (b) or (d) would preclude coverage); Landmark Realty, Inc. v. Great Am. Ins. Co., No. JKS 10-278, 2010 U.S. Dist. LEXIS 127718, at *14 (D. Md. Dec. 3, 2010) (finding an "internal inconsistency" in an additional coverage collapse provision where a partial collapse resulted in an entire building becoming condemned and unsuitable for its intended purpose); Malbco Holdings, LLC v. AMCO Ins. Co., 629 F. Supp. 2d 1185, 1195 (D. Or. 2009) (noting that the collapse provision is ambiguous, but the "clear modern trend" is to hold that

---

[6] "For the purpose of this Additional Coverage – Collapse, abrupt collapse means an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its intended purpose." [Policy at 165].

collapse coverage provisions provide coverage if there is substantial impairment of the structural integrity of any part of the building); contra, Jemiola v. Hartford Cas. Ins. Co., 229 A.3d 84, 94 (Conn. 2019) (finding similar collapse policy language to be either ambiguous or unambiguous when applied to different facts).

The Court finds the rationale in Scorpio v. Underwriters at Llyod's, London to be persuasive.[7] See 2012 U.S. Dist. LEXIS 77751, at *15. In Scorpio, the court analyzed substantially similar policy language regarding collapse coverage and determined it to be ambiguous. Id. at *9-11, 15. There, the scenario involved heavy storms that led to the accumulation of rainwater on a roof, resulting in a sudden fracture of the main roof girder and a six-inch drop of the roof, rendering the building unfit for occupancy. Id. at *15-16. The plaintiff in Scorpio, like Life Skills, argued that the policy should cover the incident because a part of the building—the roof—had collapsed. Id. at *11. The Scorpio court noted that court observed that "subsection (a) of the collapse provision, [defining an 'abrupt collapse' identically to the case at bar], arguably afforded coverage." Id. However, it also observed that because the building was still standing, "subsection (b) [precluding coverage for a building in danger of falling down] or (d) [precluding coverage for parts of buildings still standing] could be interpreted to preclude coverage Id. The court concluded that such ambiguity in the policy language rendered summary judgment in favor of the insurer inappropriate. Id. at *15.

---

[7] While the District of Rhode Island is not a binding authority, the Court finds reliance on this case to be appropriate because Rhode Island law uses comparable standards of contract interpretation to Massachusetts law. For example, under Rhode Island law, policy language may be ambiguous when it is "reasonably and clearly susceptible of different constructions," construing it in favor of the insured. Bliss Mine Rd. Condo. Ass'n v. Nationwide Prop. & Cas. Ins. Co., 11 A.3d 1078, 1084 (R.I. 2010); accord Verveine Corp., 184 N.E.3d at 1272 ("A term is ambiguous where it is susceptible of more than one meaning and reasonably intelligent people would differ as to which meaning is the proper one.").

Similarly, in this case, the definition of "collapse" as applied to the facts creates a genuine dispute that renders summary judgment improper. See id. Sections D.1 and D.2, which Life Skills cites, describe coverage for the "abrupt falling down of . . . any part of a building." [Policy at 165]. This language implies that the policy covers a "partial collapse," such as the partial detachment of the ceramics room floor, especially if caused by "hidden decay" and the room becomes unusable for its intended purpose. [Id.] In contrast, Harleysville references Section D.3 to argue that coverage is excluded because the ceramics classroom floor, although sagged, did not completely collapse to the ground but remained standing—thus characterizing the incident not as a collapse but merely as a "vertical displacement."[8]

The provisions in Section D, as noted in Scorpio, create internal inconsistencies that would restrict coverage solely to scenarios where an insured's building is in a "flattened form or rubble," thereby contravening "what an objectively reasonable insured, reading the relevant policy language, would expect to be covered." See Scorpio, 2012 U.S. Dist. LEXIS 77751, at *15; Hakim, 675 N.E.2d at 1165. If Harleysville intended for a "collapse" to require the entire building to fall to the ground immediately, this should have been explicitly defined in the Policy. As it stands, the collapse provisions are internally inconsistent and create ambiguity. In Massachusetts, when an insurance policy interpretation is in dispute, "the insured is entitled to the benefit of the

---

[8] For ease of reference, Section D.3 states:

1. This Additional Coverage – Collapse does not apply to:
   a. A building or any part of a building that is in danger of falling down or caving in;
   b. A part of a building that is standing, even if it has separated from another part of the building; or
   c. A building that is standing or any part of a building that is standing, even if it shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion.

[Policy at 165].

one that is more favorable to it." See Hakim, 675 N.E.2d at 1165. Therefore, because the Policy language "can support reasonable differences of opinion," the Court will construe it in Life Skills' favor. See id.; Minturn, 64 F.4th at 14.

### 2. Applicability of General Exclusions

Harleysville's second effort to dispose of Life Skills' claim through the Policy's general exclusions is similarly unpersuasive. Harleysville argues that "Life Skills does not dispute that the sagging was caused by hidden decay . . . which resulted from years of elevated moisture levels in the crawl space." [ECF No. 46 at 12]. Accordingly, the general exclusions contained in Section B.2.f, namely: "the presence of condensation of humidity, moisture or vapor," "unambiguously apply to bar coverage for the damage." [Id.] In response, Life Skills argues that Section D.2.a of Additional Coverage - Collapse—initially relied upon by Mr. Coffey, the independent adjuster—reestablishes coverage. [ECF No. 49 at 18].

In Easthampton Congregational Church v. Church Mut. Ins. Co., the First Circuit addressed the applicability of general exclusions in substantially similar policy language. 916 F.3d at 92. There, the court noted that if the Additional Coverage - Collapse provision was "found to provide coverage," or "if the language is ambiguous with respect to coverage," then general exclusions do not apply, and any ambiguities in the policy lead to coverage for the collapse. See id. at 92, 95. Here, as noted above, the Court finds the definition of "collapse" in the Policy to be ambiguous, thereby necessitating a construction of the term in favor of the insured, Life Skills. See id. at 93. Accordingly, because "ambiguities in the Policy result in coverage for the collapse," the general exclusions for "condensation of humidity, moisture, or vapor" are inapplicable. See id. at 95.

In sum, the interpretation and the applicability of the Additional Coverage - Collapse provision is clearly in dispute. A reasonable jury could conclude, as did Mr. Coffey and Parmian, that the ceramics classroom floor collapsed per the definition, or, as Harleysville argues, that it did

15

not. On the record before the Court, there remains a genuine dispute of material fact. Accordingly, Harleysville's motion for summary judgment is **DENIED** as to the breach of contract claim (Count I).

### B.     Unfair Claim Settlement Practices (Count III)

As an entity engaged in "trade or commerce," Life Skills brings suit under Chapter 93A § 11, alleging that Defendant violated provisions of Mass. Gen. Laws ch. 176D, §3(9). Specifically, Life Skills claims that Harleysville violated Sections 3(9)(a)-(f) by failing to "effectuate settlement although liability was reasonably clear" and that Harleysville's refusal of coverage compelled "unnecessary litigation" as described in 176D §3(9). [ECF No. 49]. In a previous order on a motion to dismiss, another session of this Court dismissed Plaintiff's 93A claim holding that "Defendant's actions cannot plausibly rise to the level of 'rascality' or 'immoral, unethical, oppressive or unscrupulous' dealings in order to sustain a claim." [ECF No. 19 (citing Ora Catering, 57 F. Supp. 3d at 110-11)]. However, that decision did not address Plaintiff's separate allegations under 176D, leaving open the possibility that the evidence might support a claim of unfair settlement practices under that section. [Id.] Upon further review, this Court now determines that, since the conduct outlined in 176D serves merely as evidence of a violation of Chapter 93A § 11 and does not constitute an independent cause of action, the dismissal of Plaintiff's Chapter 93A claim consequently invalidates its 176D claim as well.

As stated above, Chapter 93A § 2, is a Massachusetts consumer protection statute which prohibits "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." MASS. GEN. LAWS ANN. ch. 93A, § 2. Within Chapter 93A, Sections 9 and 11 create causes of action against such practices for individual consumers and for commercial plaintiffs (i.e. those who "engage in any trade or commerce"), respectively. Id. §§ 9, 11. Chapter 176D, in turn, "defines a variety of unfair claim settlement practices for insurance

companies" which may be used as evidence of unfair conduct that could be found to violate Chapter 93A." Ora Catering, 57 F. Supp. 3d at 111.

A crucial distinction exists between Sections 9 and 11 of Chapter 93A: individual consumers can utilize violations of Chapter 176D as an independent cause of action. This is explicitly stated in Section 9. Id. § 9. However, commercial plaintiffs are not afforded the same right under Section 11, which does not provide an independent basis for recovery based on unfair settlement practices as defined in 176D. Polaroid Corp., at 917 (Mass. 1993) (holding commercial plaintiff could not sustain an independent Section 11 claim against its insurers by relying solely on an alleged violations of 176D (refusal to defend) where there was no claim that the insurer committed unfair acts or practices under Chapter 93A § 2); see also Kiewit Constr. Co., 878 F. Supp. at 301 ("[T]he short, simple, and dispositive response is that the SJC itself, on at least two occasions, has also rejected the theory that commercial plaintiffs may bring suit under Section 11 of 93A for purported violations of 176D.").

Here, although Life Skills continues to rely on violations of 176D as evidence of "bad faith" in its filings, the 176D claim fails as a matter of law because Life Skills' claim under Chapter 93A was previously dismissed. [See ECF No. 19]. Accordingly, because it no longer has a predicate Chapter 93A § 2 claim available, Life Skills cannot rely on violations of 176D to sustain an independent Section 11 claim against Harleysville. See Polaroid Corp., 610 N.E.2d at 917.

Accordingly, Harleysville's motion for summary judgment is **GRANTED** as to the 176D claim (Count III).

## IV.     CONCLUSION

For the reasons stated above, Defendant's motion for summary judgment [ECF No. 48] is **DENIED** as to **Count I** (Breach of Contract) and **GRANTED** as to **Count III** (Bad Faith).

**SO ORDERED.**

Dated: August 13, 2024

                                                                                                         /s/ Margaret R. Guzman
                                                                                                         Margaret R. Guzman
                                                                                                         United States District Judge